IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
April 17, 2018 Session

## STATE OF TENNESSEE v. MICHAEL LEE HOGAN

**Appeal from the Circuit Court for Dickson County**
**No. 22CC-2015-CR-161      David Wolfe, Judge**

_____

### No. M2017-01115-CCA-R3-CD

_____

A Dickson County jury convicted the Defendant, Michael Lee Hogan, of two counts of the sale of cocaine, one count of the sale of less than .5 grams of cocaine and one count of the sale of more than .5 grams of cocaine. The trial court sentenced the Defendant as a Career Offender to an effective sentence of forty-five years of incarceration. On appeal, the Defendant contends: (1) the trial court erred when it failed to instruct the jury on the lesser-included offense of casual exchange; and (2) the trial court erred when it sentenced him. After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Jerred A. Creasy, Charlotte, Tennessee, for the appellant, Michael Lee Hogan.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Wendell Ray Crouch, Jr., District Attorney General; and Sarah Whitney Wojnarowski and David W. Wyatt, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION
### I. Facts
### A. Trial

This case arises from a series of drug transactions police officers conducted using a confidential informant ("CI"), during which the Defendant sold drugs to the CI. Based upon his actions, a Dickson County grand jury issued a presentment, charging the Defendant with, *inter alia*, one count of the sale of less than 0.5 grams of cocaine and one count of the sale of more than 0.5 grams of cocaine.

At the Defendant's trial on these charges, the parties presented the following evidence: Chris Freeze, an officer with the Drug Task Force that operated in Dickson County, described his task force as being comprised of six officers who conducted investigations in five counties. The officers, he said, relied upon CIs because they were less likely than the task force officers to raise the suspicions of the drug dealers. Officer Freeze described the rules for CIs, including, among other requirements, that they must pass repeated drug tests and that they must not say they are working for the task force.

Officer Freeze said that before a CI is allowed to purchase drugs, his or her vehicle or person is searched to ensure that the CI has no other money or drugs. Officer Freeze described how he made photocopies of the money given to a CI to purchase drugs. He said that officers record each transaction to ensure the CI's safety and to document the transaction.

Officer Freeze testified that on December 3, 2014, a CI informed him that he could purchase an ounce of cocaine from the Defendant, whose nickname was "Little Man." Officer Freeze met the CI at an appointed location, searched him and his vehicle, and then equipped the CI with an audio and video recording device. Officer Freeze said that he gave the CI $100, which was counted out on the audio and video recording. The CI was sent to the location for the drug buy, with agents going before and after him to set up in the immediate area of the buy.

Officer Freeze said that the CI called the Defendant, who assured the CI that the drug purchase was still on. The audio recording of the transaction was played for the jury.

Officer Freeze testified that, after the drug buy, the CI brought the drug evidence back to him at an appointed location. He then placed it in an evidence bag and delivered it to the Tennessee Bureau of Investigations ("TBI") crime laboratory.

During cross-examination, Officer Freeze testified that CIs were sometimes paid for their work if the drug buy was successful. The CIs could make money for each successful purchase, so the more they purchased the more money they earned. The CI in this case was a paid informant and received $100 per successful drug purchase. Officer Freeze said that, after a suspect was arrested, he or she was often offered the opportunity to help law enforcement officers by providing information about where and from whom they bought their drugs. Officer Freeze said that he would relay information about whether the suspect cooperated to the District Attorney but that it was not his decision whether the charges were lessened based upon a suspect's cooperation.

2

The CI in this case testified that he had been working as a CI for a little more than a year. The CI stated that he received a BS in physical education from David Lipscomb University, and he started teaching high school science and math in West Memphis, Arkansas, and then Knoxville. He traveled as a missionary to Austria. The CI said that, due to the stresses of his career and life, he began abusing prescription narcotics. Shortly thereafter, he was introduced to crack cocaine, which "utterly devastated his life." The CI said he lost his wife, his home, and his career as a result of his drug use. Each time he started a new life, he relapsed. The CI testified that at this point in his life, however, he was clean and had been for a year.

The CI testified that he began working with the task force after being arrested in possession of a small amount of cocaine and a crack pipe. Detective Brian Beasley offered him the opportunity to work as a paid CI. He took the opportunity to help himself get out of trouble and also to beat his addiction by burning the bridges he had with drug dealers. He said he was fifty-three years old at the time of trial and had almost nothing because his life had been "wasted" due to drug use. He hoped to prevent others from destroying their lives the way he had destroyed his own.

The CI said that, while he was still using drugs, he had purchased crack cocaine from the Defendant on several occasions. While the two were "friendly" when they met, they were not friends and never used drugs together. The CI said that he contacted the Defendant about purchasing drugs on December 3, 2014, and the Defendant offered to sell him one gram of crack cocaine for $100. The CI described meeting Officer Freeze before the purchase, and confirmed the he was searched and given audio/video recording equipment and drug buy money.

The CI testified that, when he arrived to meet the Defendant, the Defendant got into his car. He handed the Defendant the $100, and said "here's your bill," and the Defendant gave him two packages of crack cocaine. The CI noted that, on the recording, the two men discussed that the CI owed the Defendant "a dime," The CI explained that he owed the Defendant $10 from a previous purchase of crack cocaine. The CI said that, after the drug purchase, he placed the crack cocaine on the seat of his car and aimed the camera at the drugs, so that there would be no question about whether he touched the drugs. The CI then went back to the appointed meeting location and gave the drugs to the officers. They also searched him again and retrieved the audio/video recording equipment.

The CI said that he made a second purchase of drugs from the Defendant, this one occurring on December 12, 2014. He said that, on this occasion, he arranged to purchase two grams of crack cocaine for $200. He said that the Defendant also offered to sell him a pistol for an additional $200. The CI said that after he arranged the deal, he called the

task force officers, who approved the deal.

The CI said that this deal was different from the first in that the plan was for the CI to go get the Defendant from Waverly and drive him to Dickson. He assumed he would make the purchase at that time. The CI met the Drug Task Force officers in Waverly and again was searched, given money, and outfitted with audio/video recording equipment. When the CI picked up the Defendant, however, the Defendant said he had neither the drugs nor the gun. The Defendant told him that he would have to go to a location in Dickson and get the drugs to resell to the CI and that the gun was located at the Defendant's home.

The State played an audio recording of the transaction. The transaction occurred at night, so the video recording was not clear. On the audio recording, the Defendant said that he did not have the pistol, and the CI said that he wanted it and that they should go back and get it. The CI said that the two went back to where he picked up the Defendant and both went into the home. The CI can be heard on the audio recording greeting other people in the house. While the audio recording is not clear, the CI said that he purchased the gun, which the Defendant showed him how to use, and counted out the money for the gun. He then asked about the drugs, and the Defendant told him that they had to go to Dickson to get them, and the CI said "oh man."

The two men drove from Waverly to Dickson, and the audio recording showed them making casual conversation. The Defendant told the CI to drop him off at a residence and then go wait at an AutoZone near the residence while the Defendant purchased the drugs. The Defendant called the CI while he was at AutoZone and told him that he was ready. The CI picked him up and returned to AutoZone, where the Defendant sold him the drugs, and the CI can be heard counting out the $200 on the audio recording. The Defendant wanted to leave and go buy something to eat, and, in accordance with the prearranged plan, Dickson Police pulled up and stopped them.

The CI said that he did not want the Defendant to know that he was working with police, so he acted surprised and nervous and did not give the police permission to search the truck. When the officer was frisking the CI, the CI whispered to the officer that the drugs were under the floor mat. The CI and the Defendant were in the police car and at the police station together. In order to separate them, the officers said that the CI had an arrest warrant in Hickman County and that he needed to be transported there. The CI then met again with task force officers to finish the operation.

During cross-examination, the CI testified that the Defendant may have been in the CI's home at some point but that he could not recall for certain. The CI agreed that there were no recordings of the calls he initially placed to arrange the drug purchases

4

with the Defendant. The CI agreed that in the recording an officer could be heard finding a pill in the car after the arrest. He explained that it was a tiny pill for which he had a prescription, and that the officers must have missed it during the initial search.

Bronzon Morgan, who was a member of the Drug Task Force at the time of the Defendant's arrest, testified that he received a call related to this case informing him that the task force needed him to set up in an undercover car on December 12, 2014, across from a residence at the Pyramid Trailer Park. Officer Morgan testified that he watched the trailer in which the Defendant, whom he described as a "larger black male," was located until the CI came to pick him up. He watched the two men get into the truck together, leave, and then return to the residence for a short period of time. When they returned, the men both got out of the truck, went in the house, came back out of the house, and left in the truck again. Officer Morgan said that he followed the truck for some distance between Waverly and Dickson. He did not see them stop at any point.

Agent Ronnie Moran, an agent with the Drug Task Force, testified that he assisted Agent Freeze with these controlled buys. He said that he helped search the CI's vehicle before the first buy on December 3, 2014, and also searched the CI after the drug buy. He did not find any drugs on the CI or in his vehicle, other than the drugs that the CI purchased for the task force.

Agent Moran testified that he was the main case agent for the second buy on December 12, 2014. He said that the CI set up the deal, which Agent Moran recorded with audio and video equipment. The agent said that the audio/video equipment cut off after thirty minutes because it ran out of battery power.

Agent Moran described searching the CI's vehicle and person before the December 12, 2014 drug buy. He said that he listened as the CI placed a phone call arranging the drug purchase and then he provided the CI the money to purchase the drugs and also the gun. Agent Moran said that he documented the serial numbers of the money that he gave to the CI. After the purchase was complete and the Defendant was arrested, another agent, Agent Jimmy Mann, searched the Defendant, and he found currency bearing the same serial numbers in the Defendant's pocket.

About the drug transaction, Agent Moran said that they followed the CI to the trailer where he was supposed to pick up the Defendant. He said that the Defendant got into the CI's vehicle, and the two left. They returned to the trailer because the Defendant did not have the gun with him that the CI was to purchase. The two returned to the trailer and the Defendant got the gun. Agent Moran testified that he followed the CI's vehicle as it went to Dickson and he saw the CI drop off the Defendant near the AutoZone.

5

Agent Moran said that they followed the CI to the AutoZone and heard him get a phone call from the Defendant informing the CI that the Defendant had successfully purchased the drugs and asking the CI to come back and get him. Agent Moran said that then, as prearranged, Deputy Kyle Chessor and Agent Mann stopped the CI's vehicle. The officers, in accordance with the plan, requested a drug detection dog, and the CI told the officers that the crack was in three bags under the floor mat on the driver's side. Agent Moran said that he took custody of both the drugs and the gun and he turned them in to evidence.

During cross-examination, Agent Moran testified that he did not find any prescription drugs or a money bag on the CI when he searched his vehicle and his person before the controlled buy. Agent Moran said that he did not initially stop the CI after the drug buy, but he came later during the search. He agreed that his voice can be heard on the recording saying to the CI that he should get an Academy Award. He explained that he said as much because the CI did a "great job."

Kyle Chessor, an Agent with the Drug Enforcement Administration ("DEA"), testified that he was also affiliated with the Dickson County Sheriff's Department, who paid his "base pay." Agent Chessor said that he was involved in the December 12, 2014, drug purchase. He followed the CI from Humphreys County to Dickson County in a marked vehicle, so he stayed at a distance so as not to alert the Defendant. In accordance with the plan, when he received notice that the transaction was complete, he initiated a traffic stop while the CI was still in the parking lot. The agent explained that the goal was to avoid any kind of a pursuit.

Agent Chessor said that he approached the CI and the Defendant and told them that there had been a call about "suspicious activity." Agent Chessor said that this "ruse" was to avoid the Defendant knowing that the CI was working with police. Agent Chessor asked to search the vehicle, and the CI said "no." The officers had a canine on standby, and they called him to the scene. The canine indicated that there were drugs in the vehicle. Agent Chessor said that he put the CI in his vehicle, saying in front of the Defendant that the CI had warrants out for his arrest in Hickman County. After the two drove away, he circled back to the Drug Task Force office to release the CI.

Angela Sanders with the Tennessee Bureau of Investigations ("TBI") in Nashville testified that she received the evidence in this case from Agent Moran, who brought it to her office. Lela Jackson, also with the TBI, tested the evidence in this case. She said that she tested two plastic bags containing a chunky white powder from the drug sale occurring on December 3, 2014. She determined that the bags weighed .24 grams and .21 grams, respectively, for a total weight of .45 grams. The contents of both bags were cocaine hydrochloride. She also tested three plastic bags obtained after the December 12,

2014 drug sale, all of which were contained in a large ziplock baggie. She said that all the bags contained an off-white rock-like substance. The first weighed .45 grams, the second weighed .45 grams, and the third weighed .53 grams. She analyzed the first two bags and determined that they contained cocaine in a total amount of .94 grams but did not analyze the third. She explained that, according to the scheduling guidelines, an amount more than .5 grams is significant, but the next cut off weight would be 26 grams. Agent Jackson testified that the third bag, weighing .53 grams, would be inconsequential in that she had already reached the .5 gram threshold and the third bag would not have raised the total weight to 26 grams.

Based upon this evidence, the jury convicted the Defendant of two counts of the sale of cocaine, one count being the sale of less than .5 grams of cocaine, and one count being the sale of more than .5 grams of cocaine.

## B. Sentencing

At the Defendant's sentencing hearing, the parties presented the following evidence: Stephanie Ellis Hearndon, an officer with the Tennessee Board of Probation and Parole, testified that she prepared the presentence report in this case. As part of her preparation, she documented the Defendant's prior criminal history, which included eleven pages of documentation. The Defendant's criminal history began in January of 1991, and continued to the time of the drug sales in this case, that occurred while he was on probation for another drug offense. Ms. Hearndon said that the Defendant had multiple felony convictions.

Ms. Hearndon said that the State had requested that the trial court apply three enhancement factors: that the Defendant had a history of criminal convictions in addition to those necessary to establish his range; that the Defendant had previously failed to comply with conditions of his sentence involving release into the community; and that the Defendant was on probation at the time of the offense. T.C.A. §§ 40-35-114 (1),(8) and (13) (2014).

Ms. Hearndon testified that the Defendant was a wanted person in Humphreys County for an outstanding warrant for possession of a weapon. Ms. Hearndon noted that the Defendant had failed to appear in court on March 27, 2015, on a separate cocaine charge. The Defendant's employment history included his working in several restaurants as a "cook." The duration of his employment lasted between four and twelve months before he would change employers. He had last worked at a Popeye's restaurant.

During cross-examination, Ms. Hearndon agreed that there were no listed victims in the case. She agreed that the Defendant had described to her what he said he believed

was his own drug addiction.

Agent Freeze testified and described his interactions with the Defendant in the fifteen years that Agent Freeze had been an officer. He said that he was familiar with the Defendant from the agent's time on patrol and also during his employment as a supervisor at the jail. Agent Freeze said that he had used several CIs to purchase drugs from the Defendant but that he had never heard of the Defendant using drugs. He had also never known the Defendant to be in possession of drug paraphernalia when arrested.

Based upon this evidence, the trial court made the following findings:

All right. I think both sides are in agreement that, unlike many of our sentencing hearings, this is a case that really . . . does not involve the possibility of any sort of probation. So . . . going into any of [the sentencing factors] does not apply.

This Court is well aware of the fact that under the sentencing considerations of 40-35-103 of the Tennessee Code, I look at, (As Read) Confinement is necessary to protect society by restraining a Defendant with a long history of criminal conduct. (Reading ends) That clearly applies.

(As Read) Confinement is necessary to avoid depreciating the seriousness of the offense and confinement is particularly suited to provide an effective deterrence of others likely to commit similar offenses. Or C, measures less restrictive than confinement have frequently and recently been applied unsuccessfully to the Defendant. (Reading ends) All of those apply to [the Defendant].

We go forward. (As Read) Potential for lack -- Or potential for rehabilitation or treatment should be considered. (Reading ends) I don't find any evidence in this record to show [the Defendant] uses drugs or has a drug problem other than his own self-serving statement. And in my opinion, at least, there was no evidence at trial or at this hearing that he has any sort of drug problem, other than the fact that he sells drugs for a living.

There are no mitigating factors that I find having reviewed the entire list of mitigating factors. I do not find any of those to apply to this case.

The enhancement factors, number one, he has a previous history of criminal convictions and criminal behavior, in addition to those necessary to establish the appropriate range. That may or may not apply considering

8

we're looking at a career criminal status.

But he has more convictions, clearly some 11 pages of convictions, and some are misdemeanors and some are felonies. But he has clearly more than enough to apply -- to make him a career criminal. And in just a moment I'll deal with that. If they are the type that it would apply -- or it would be applied to the criminal career status. But there are clearly a number of other convictions, and so that factor would apply.

Number 8, (As Read) The Defendant before trial or sentencing failed to comply with the conditions of the sentence involving release into the community. (Reading ends) He was on probation at the time this occurred.

And Number 13, (As Read) At the time the felony was committed, one of the following classifications was applicable. (Reading ends) He was released on probation. So all of those apply to [the Defendant] as enhancement factors.

Going on then to look at the career criminal classification, which requires six A, B, or C, or a combination of any of the above felony convictions. [The Defendant's attorney], who was appointed to represent [the Defendant] has done a good job at trial, and a good job here to try to minimize the conduct of [the Defendant].

And he argues that because two of the convictions that are out of Williamson County are close in time, that that would, in fact, raise some sort of an inference that maybe those are not proper convictions or that the dates are incorrect.

The reason for that is because the statute on a career offender says that if it's committed within a -- offenses committed within a 24-hour period are not to be considered separate offenses. However, this was committed on 7/11/2000 and 7/13/2000.

In the case before me, [the Defendant] was charged with committing an offense on December the 3rd, 2014, and December the 12th. Nine days. It's close in time, not as close as these are. But the fact that they are two days apart does not raise any inference of an incorrect -- does not raise any question really.

Because, clearly, if they are sales, possession or sale charges, which

I think these are -- let me make sure. This is manufacturing and sale of cocaine. Both of these were. So just like in our present case, the sales of cocaine on the 11th of -- July 11th, 2000 and July 13th, 2000 would be consistent with this case and with all other drug sale cases.

So, this Court finds that there is no contradiction of these records; in other words, the certified judgments and convictions have been introduced. They have not been rebutted.

The Court, therefore, finds that they have been proven beyond a reasonable doubt that [the Defendant] has six qualifying convictions, and is therefore considered to be a career offender. Which means, that as to the sentences, as to the Class C felony of Count I, he is sentenced to the top of the range for a Class C by the statute. That would be 15 years in the Department of Corrections.

On the Count 2 of the indictment, as a class – career offender, and that's a Class 3 or Range 3. And because he is a career offender, that's to the top of the range, which is 30 years.

The question then becomes as to consecutive sentencing. And when I turn to the statutory guidelines on career sentencing, it says, (As Read) If a Defendant is convicted of more than one criminal offense, the Court shall order sentences to run consecutively or concurrently as provided by the criteria in this section.

The Court may order sentences to run consecutively if the Court finds by a preponderance of the evidence that, one, the Defendant is a professional criminal who has knowingly devoted the Defendant's life to criminal acts as a major source of livelihood. (Reading ends)

This presentence report shows 25 years or more of criminal activity by [the Defendant]. I don't know how you could classify him as anything other than a career criminal or a person who has made his entire life as a professional criminal.

(As Read) Two, the Defendant is an offender whose record of criminal activity is extensive. (Reading ends) I think that goes without saying, that applies in this case.

Then moving over to Number 7 6, rather, (As Read) The Defendant

10

is sentenced for an offense committed while on probation. (Reading ends) Clearly, the Court takes judicial notice that he was on probation at the time. There is a pending [violation of probation] right now because of that.

So out of those seven factors three of them apply. And this Court finds consecutive sentencing is appropriate.

Therefore, the sentences in Count 1 and Count 2 of this indictment will run consecutive to one another, and consecutive to the -- by law, it's consecutive for the matter for which he is on probation, if, in fact, he is revoked to probation.

That's the judgment of the Court in this case.

It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends: (1) the trial court erred when it failed to instruct the jury on the lesser-included offense of casual exchange; and (2) the trial court erred when it sentenced him.

### A. Lesser-Included Offense of Casual Exchange

The Defendant contends that the trial court erred when it failed to instruct the jury on the lesser-included offense of casual exchange in Count II of the indictment, a decision he says the trial court made based solely on the quantity of drugs involved. He further contends that the trial court's failure to give the casual exchange instruction in Count II when it had given the casual exchange instruction in Count I, led the jury to "a changing of convictions in Count I from casual exchange to sale of cocaine under .5 grams." The State responds that the Defendant was not entitled to a casual exchange instruction in Count II because the proof did not warrant it. We agree with the State.

"Whether the trial court properly instructed the jury on a certain offense is a mixed question of law and fact," which we review de novo with no presumption of correctness. *State v. Howard*, 504 S.W.3d 260, 267 (Tenn. 2016). A trial court must instruct the jury on a lesser-included offense if it "determines that any evidence as to a lesser-included offense exists that reasonable minds could accept and that the evidence, viewed liberally in the light most favorable to the lesser-included offense, is legally sufficient to support a conviction." *Id.* at 268.

The first question we must address is whether casual exchange is a lesser-included offense of the sale of .5 grams or more of cocaine. According to Tennessee Code Annotated section 48-18-110(f) (2014):

(f) An offense is a lesser included offense if:

(1) All of its statutory elements are included within the statutory elements of the offense charged;

(2) The offense is facilitation of the offense charged or of an offense that otherwise meets the definition of lesser included offense in subdivision (f)(1);

(3) The offense is an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser included offense in subdivision (f)(1); or

(4) The offense is solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser included offense in subdivision (f)(1).

Casual exchange is a lesser-included offense of the sale of cocaine because all of the elements of the lesser offense are included in the greater offense. *See, e.g., State v. Edward P. Harris*, No. 01C01-9810-CR-00392, 2000 WL 19536, at *2 (Tenn. Crim. App., Nashville, Jan. 13, 2000) ("[I]t is at least arguable that the statutory elements of casual exchange are included within the statutory elements of sale of cocaine."), *no Tenn. R. App. P. 11 application filed*. Accordingly, we turn to decide whether the proof supported the trial court giving a casual exchange instruction.

A defendant commits the offense of sale of cocaine when he knowingly sells the cocaine. T.C.A. § 39-17-417(a)(3) (2014). A sale occurs when there is "a bargained for offer and acceptance, and an actual or constructive transfer or delivery of the [drugs]." *State v. Holston*, 94 S.W.3d 507, 510 (Tenn. Crim. App. 2002). The offense is a Class B felony if the substance is cocaine and weighs .5 grams or more. T.C.A. 39-17-417(b) (2014). In contrast, a defendant commits the offense of casual exchange of cocaine when he knowingly and casually exchanges the cocaine. T.C.A. § 39-17-418(a) (2014). BLACK'S LAW DICTIONARY 562 (6th ed. 1990) notes that the "criterion in determining whether a transaction is a sale or an exchange is whether there is a determination of value of things exchanged, and if no price is set for either property it is an 'exchange.'" *Cf. State v. Helton*, 507 S.W.2d 117, 121 (Tenn. 1974). Of course, the involvement of money does not preclude the finding of an exchange rather than a sale. *State v. Carey*,

914 S.W.2d 93, 96 (Tenn. Crim. App. 1995). However, under Tennessee Code Annotated section 39-17-418(a), any transfer or delivery of the drugs must be done casually, i.e., without design or any prior plan. *Carey*, 914 S.W.2d at 96; *Loveday v. State*, 546 S.W.2d 822, 827 (Tenn. Crim. App. 1976). Webster's Third International Dictionary 349 (1993) further defines "casual" as subject to or produced as a result of chance . . . without design: not resulting from a plan . . . occurring . . . by chance or without calculated intent . . . without specific motivation, special interest, or constant purpose . . . without foresight, plan or method . . . . *See also* BLACK'S LAW DICTIONARY at 218.

In short, one could posit that a casual exchange is simply the transfer of drugs without the characteristics of bargaining, pecuniary motive, and design typical of a sale. Thus, a common example of a casual exchange is the spontaneous passing of a small amount of drugs at a party. *State v. Copeland*, 983 S.W.2d 703, 708 (Tenn. Crim. App. 1998). In any event, whether the offense of casual exchange requires the absence of elements implicit in a sale or something more, we believe that any additional elements merely establish "a less serious harm . . . to the same . . . public interest . . . ." *State v. Burns*, 6 S.W.3d 453, 467 (Tenn. 2016). The casual exchange of drugs is a misdemeanor offense. T.C.A. §§ 39-17-418(a), (c).

Applying this standard, we conclude that the offense of casual exchange does not contemplate the type of transaction established by the evidence in Count II of this case. According to the record, the Defendant and the CI were not friends and had never engaged in the use of drugs together. The CI testified that the Defendant had not been to his home, and if he had been there, it was only on one brief occasion. The CI contacted the Defendant by telephone for the sole purpose of obtaining drugs, and the two agreed on a price and quantity for the cocaine. The CI picked up the Defendant and took him to a location where the Defendant could secure the cocaine for resale to the CI, and the CI gave the Defendant the agreed amount of money in exchange for the drugs. The quantity of drugs was some quantity more than .5 grams, and included three rocks in three baggies. In short, the evidence in the record reflects nothing less than the sale of cocaine. *See State v. Michael Moore*, No. 02C01-9705-CR-00180, 1997 WL 703343, at *1 (Tenn. Crim. App. at Jackson, Nov. 13, 1997), *perm. app. denied* (Tenn. July 13, 1998).

The Defendant further contends that, because the trial court instructed the jury on casual exchange in Count I it somehow influenced the jury in Count II, making the jury reject the casual exchange conviction in both counts and convict him of the sale of cocaine in both counts. In our view, given the facts, the trial court did not need to give a casual exchange instruction in Count I. The trial court, however, did not err when it determined in its discretion to so instruct the jury. The jury by its verdict, however, determined that the Defendant had sold the cocaine and not casually exchanged it with

13

the CI. We find unpersuasive the Defendant's argument that the jury's conviction of the sale of cocaine in Count I, when instructed on casual exchange, somehow influenced the jury's conviction of the sale of cocaine in Count II. We similarly find unpersuasive any argument that the jury not being instructed on casual exchange in Count II somehow influenced its verdict in Count I. The Defendant is not entitled to relief.

## B. Sentencing

The Defendant contends that the trial court erred when it sentenced him to consecutive sentences because the effective sentence of forty-five years is not justly deserved in relation to the seriousness of the offense. He asserts that a forty-five-year sentence for a non-violent offense is excessive. The State counters that the trial court properly sentenced the Defendant. We agree with the State,

The trial court in this case determined that the Defendant had six qualifying convictions, which made him a Career Offender by statute. Further, by statute, he was required to be sentenced to the top end of his range, which was, respectively, fifteen years for the Class C felony and thirty years for the Class B felony. When deciding consecutive sentencing, the trial court found: that the Defendant was a professional criminal who has knowingly devoted the Defendant's life to criminal acts as a major source of livelihood, based on his more than twenty-five years of criminal activity; that the Defendant had a record of extensive criminal activity; and that the Defendant committed the offense while on probation.

In *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012) the Tennessee Supreme Court reviewed changes in sentencing law and the impact on appellate review of sentencing decisions. The Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id*. at 554-55; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. So long as the trial court sentences within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id*. at 707.

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210 (2014); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103 (2014).

A trial court may impose consecutive sentences when it finds by a preponderance of the evidence that:

(b) The court may order sentences to run consecutively if the court finds by a preponderance of the evidence that:

(1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(6) The defendant is sentenced for an offense committed while on probation;

T.C.A. § 40-35-115 (2014).

We conclude that the trial court did not err when it ordered consecutive sentences. The Defendant was required by statute to be sentenced at the top of his range based upon his previous convictions, which qualified him as a Career Offender. His criminal history included numerous other convictions and very little work history. The Defendant had eight convictions for sale of a Schedule II drug, in addition to convictions for driving on a revoked license, failure to appear, and possession of a weapon as a convicted felon. He also sold the CI in this case a firearm. The Defendant was on probation at the time that he conducted both of these drug transactions. The record supports the trial court's finding of the three enumerated factors in determining that the Defendant's sentences should run consecutively. The Defendant is not entitled to relief on this issue.

15

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE